**NAKAJIMA ALL CO., LTD., Plaintiff,**

and

**Sears Roebuck Company, Intervenor–Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Smith Corona Corporation, Intervenor–Defendant.**

Court No. 87–01–00089.

United States Court of International Trade.

July 20, 1990.

McDermott, Will & Emery (R. Sarah Compton, Kurt J. Olson, Patrick J. Cumberland and David J. Levine), Patton, Boggs & Blow (Frank R. Samolis, Michael D. Esch and Jeffrey L. Turner) and Benjamin L.

Irvin, Washington, D.C., of counsel, for plaintiff.

Barnes, Richardson & Colburn (Robert E. Burke and Brian F. Walsh), Chicago, Ill., for intervenor-plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Washington, D.C., Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Velta A. Melnbrencis), New York City, and Offices of the Deputy Chief and the Chief Counsel for Import Admin., U.S. Dept. of Commerce and (Pamela Green, Washington, D.C., Lisa B. Koteen) for defendant.

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and John M. Breen, Washington, D.C.), Robert E. Walton, Smith Corona Corp., of counsel, for the intervenor-defendant.

## OPINION AND ORDER

AQUILINO, Judge:

The plaintiff has interposed a motion for judgment on the record compiled by the International Trade Administration, U.S. Department of Commerce ("ITA") *sub nom. Portable Electric Typewriters From Japan; Final Results of Antidumping Duty Administrative Review,* 52 Fed.Reg. 1,504 (Jan. 14, 1987). One of those results was a dumping margin of 16.40 percent for Nakajima portable electric typewriters ("PETs") sold or imported into the United States during the period May 1, 1981 to April 30, 1982 which the plaintiff contends is unsupported by substantial evidence on the record and otherwise not in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B). Jurisdiction of the court is pursuant to 28 U.S.C. § 1581(c).

### I

On May 9, 1980, the ITA published an antidumping-duty order covering PETs from Japan, 45 Fed.Reg. 30,618. The margin of dumping set forth therein for the plaintiff was 4.36 percent. Thereafter, pursuant to 19 U.S.C. § 1675, the agency conducted an administrative review of its order, first covering the period January 30–April 30, 1980. It concluded that the

margin for those months was 0.27 percent or *de minimis* and thus determined not to require cash deposits of estimated antidumping duties on subsequent entries of plaintiff's PETs. *See Portable Electric Typewriters from Japan; Final Results of Administrative Review of Antidumping Duty Order,* 47 Fed.Reg. 33,306, 33,308 (Aug. 2, 1982).

During the review proceedings, the petitioner Smith–Corona Group, Consumer Products Division, SCM Corporation had argued that foreign-market value be based on home-market rather than third-country sales and furnished the ITA with a voluminous market research report in support of its position that there were reasonable grounds for the agency to believe or suspect that the Nakajima sales under consideration had been below the cost of production, thereby requiring that the merchandise's foreign-market value be constructed. The ITA disagreed that sales in the home market should be the basis of comparison and further stated that it had

> received and verified cost of production information for 1980 on merchandise produced by Nakajima ... for sale to countries other than the U.S. A review of this information revealed that there were no sales below the cost of production. *Id.* at 33,307.

In conjunction with the second administrative review, covering the year May 1, 1980 through April 30, 1981, the petitioner again sought to impress upon the agency its previous position, based for the most part on the research report. The ITA again disagreed, responding that:

> SCM did not adequately comply with the Department's request for proper source and background information for the market research report. Therefore, we did not conduct a further investigation of Nakajima's cost of production. Moreover, we maintain that we conducted a thorough verification of all elements of Nakajima's cost of production and are satisfied that all appropriate costs are included. The verified cost of purchased parts included material and labor, and were arms-length transactions. We veri-

fied that the labor costs were for all steps of the Nakajima production process. We did not accept Nakajima's reported method of allocating indirect labor, thereby increasing the overall unit labor costs. Concerning SCM's allegation that related parties incurred certain expenses, we did not pursue this issue again because of difficulties with the market research report.

*Portable Electric Typewriters From Japan; Final Results of Administrative Review of Antidumping Duty Order*, 48 Fed. Reg. 40,761, 40,767 (Sept. 9, 1983). Those results included a weighted-average margin of 0.17 percent for plaintiff's PETs which was *de minimis* and led the agency to continue the waiver of any cash deposits for that merchandise. *See id.* at 40,768.

II

At issue in this action is the third administrative review, which covered the year May 1, 1981 through April 30, 1982 and plaintiff's PET models 7500, M100, 8500, 8600 and 8800C, in order of ascending sophistication.[1] The plaintiff contests not only the final results of that review but also the ITA's conduct leading to them. Hence, it is appropriate to describe the proceedings in some detail.

In March 1983, Nakajima filed responses to the ITA's questionnaire, ConfDoc 3, which indicated no or *de minimis* margins of dumping during the year under review. The agency scheduled verification of those responses and invited comments on them from the petitioner, which submitted a brief in November 1983, taking the position once more that home-market, rather than third-country, sales should be used to determine foreign-market value and also that the sales in the home market had been below the cost of production. The SCM research report was resubmitted to the ITA upon an offer to "attempt to provide whatever additional information is deemed necessary by the agency". ConfDoc 22 at 6.

This time, the ITA agreed to base foreign-market value on home-market sales, in view of the questionnaire responses, and it also decided to require verification of Nakajima's costs of production. *See* ConfDoc 24. Accordingly, the agency wrote to counsel:

... Since the cost of production information was not required as part of our original questionnaire, please have a nonconfidential version of Nakajima's cost data for fiscal year 1982 available at the verification.[2]

Verification took place in Japan in March 1984, with the ITA team's reporting that, "[a]lthough some errors and differences were found (considered negligible)", Nakajima "was able to substantiate" its questionnaire responses. ConfDoc 28 at 15. As for investigation of the costs of production, the team focused on the model 8800C. The company apparently made available a listing of production costs for that machine, including those for materials and labor, factory overhead, selling expenses, and assembly by a related company, all of which the team proceeded to verify. The report was explicit as to the methods used to accomplish the verification of the information presented, and traced each category of specific cost claimed on the 8800C to data filed with various Japanese ministries. *See generally* ConfDoc 124. The report stated, among other things, that the production costs for the model 8600 were approximately the same as for the 8800C and that, since "all [PETs] go through the same production line", the labor cost applicable to the model 8800C was the same for all electric models. *Id.* at 2.

After this verification, in May 1984, Nakajima applied for revocation of the antidumping-duty order as against it in view of the lack of any actionable dumping during the preceding two years. *Cf.* 19 C.F.R. § 353.54 (1984). The record does not indicate that the ITA formally ruled on this application, only that it would not require further administrative-review questionnaire

---

1. Of those models, the most-sophisticated 8800C was also most important in terms of sales volume and value. *Compare* confidential document ("ConfDoc") 3, p. 9 *with id.* at 6–8 and 10.

2. Public Record Document ("R.Doc") 104 at 3.

responses from the company pending disposition of the request. *See* R.Doc 117. Then, in March 1985 the agency referred to "changed circumstances" without any explanation [3], and the respondent was thereafter notified that, in order to "proceed with analysis of the cost of production data already submitted", the ITA needed additional information on the "normal leadtime" between the purchase of materials, the production process and the actual shipments of the finished products, and also confirmation that the leadtime was the same for both the home and U.S. markets. R.Doc 179.

The respondent answered that there had been only one or two production runs for the home market which covered several months' requirements, that the leadtime for shipment of PETs in that market was the same as for the U.S., that basic materials had been purchased in large volumes, resulting in virtually stable prices, and that practically all of the purchasing for the machines sold during the review period had occurred during its fiscal year. *See* R.Doc 192.

Nevertheless, the ITA indicated that it would re-investigate the costs of production for the review period. The reason given was that the agency files did not reflect submission of cost data for fiscal year 1981 and of selling and general expenses for calendar year 1981. The company insisted that the ITA had already determined it had not sold below cost during 1981–82 and that the agency possessed all the information needed to complete the investigation. Counsel also pointed to the verification report of October 30, 1982 in which the ITA had stated that it "ha[d] found no sales below cost of production" and to the fact that all materials costs for fiscal year 1981 had been verified in May 1984. *See* R.Docs 380, 381. But Nakajima was formally notified by letter dated June 25, 1985 that "additional information on the cost-of-production of merchandise sold during the period" was necessary to complete the review. Specifically, the ITA requested information on the cost of all materials necessary for PET production, plus transportation; the cost of fabrication (direct and indirect labor, direct and indirect manufacturing); and general expenses. *See* R.Doc 200.

The information was provided on July 8, 1985. The agency scheduled verification at Nakajima's Tokyo office for July 17 and at its factory in Nagano on July 18–19, 1985. However, the team was apparently delayed at another Japanese manufacturer and then went directly to Nagano on July 18th. The next day, the team allegedly came to the conclusion that it was "getting nowhere" [4] and departed. Its report on the visit, filed some six months later (in January 1986), states:

> Our purpose in conducting this verification at the Nagono [*sic*] factory was to verify cost of production data. We were unsuccessful in our attempt from the beginning.

ConfDoc 93 at 4. Nevertheless, as the report indicates, the "intended approach to verification ... was to reconcile costs incurred in the production of portable electric typewriters to a set of audited financial statements" [*id.* at 2], and such statements were in fact produced by Nakajima along with considerable other documentation, which apparently was not looked at by the team.

In any event, after the report had been rendered, the respondent sought to reconcile discrepancies contained therein. However, in April 1986 the ITA informed the petitioner that it was "considering the use of best information available to determine Nakajima's U.S. price and foreign market value". R.Doc 256. SCM referred anew to its research report, ConfDoc 1.

The ITA published the preliminary results of its review on July 1, 1986, reciting its reported inability to verify Nakajima's costs of production and stating that therefore it had

> calculated foreign market value for that firm based on the best information available. The best information available was

---

3. *See* R.Doc 163.

4. R.Doc 344 at 123.

petitioner-submitted data on constructed value.

*Portable Electric Typewriters From Japan; Preliminary Results of Antidumping Duty Administrative Review,* 51 Fed. Reg. 23,804, 23,805. In other words, the previously-rejected research report was accepted at face value, which provided a basis for a margin of 23.41 percent for Nakajima.

Again, the respondent spent the ensuing months attempting to reconcile differences. Among other points pressed was the agency's failure to take into account the data for the key model 8800C which had been verified more than two years earlier. In the end, the ITA reversed itself as to that PET though not otherwise:

> ... [W]e have confined our use of Nakajima's data to that which was specifically verified. Thus, we have accepted only Nakajima's costs on one model, 8800c. The costs for this model were verified in a report from our Tokyo office dated May 18, 1984. For all other models produced we have used the best information available.

52 Fed.Reg. at 1,510. But that information, set forth in the petitioner's market research report, did not specifically cover Nakajima models M100, 8500 and 8600, just the 7500 in addition to the 8800C. Thus, while accepting the verified data for that most-sophisticated model, the agency also chose the 8800C to serve as surrogate in the construction of value for the three middle models. However, in this regard, the research-report, as opposed to the verified, 8800C information was relied on.

As stated at the outset, the data combined resulted in a final dumping margin of 16.40 percent and also in this lawsuit.

### III

■ The primary issue raised now is "[w]hether the Department's investigation of Nakajima's cost of production without the requisite reasonable suspicion was authorized by law." Plaintiff's Memorandum, p. 6.

The law implicated is the Trade Agreements Act of 1979, as amended. Subsection (a)(1) of 19 U.S.C. § 1677b provides, in part, that foreign-market value of imported merchandise shall be the price (A) at which such or similar merchandise is sold in the principal markets of the country from which exported, or (B), if not sold for home consumption or sold in such small quantities as to form an inadequate basis for comparison, then sold to countries other than the United States. Subsection (a)(2) states that, if the ITA concludes that foreign-market value cannot be determined as aforesaid, such value may be constructed as prescribed by 19 U.S.C. § 1677b(e). Furthermore:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales made at less than cost of production—
>
> > (1) have been made over an extended period of time and in substantial quantities, and
> >
> > (2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade,
>
> such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value under subsection (a) of this section, the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.

19 U.S.C. § 1677b(b). This is the provision placed most directly into focus by the foregoing issue the plaintiff raises.

## A

On its part, the defendant questions the qbility of the plaintiff to press this issue, arguing that it was not raised below and therefore is not appropriate on appeal. However, the record reveals objection on the part of the respondent to the ITA's decision to reinvestigate its costs of production. *See, e.g.*, R.Docs 380 at 2 and 381; ConfDocs 82 at 1 and 117 at 1. *Cf. Hercules, Inc. v. United States*, 11 CIT 710, 730–31, 673 F.Supp. 454, 473 (1987).

## B

Essentially, plaintiff's position is that the only thing in the record which even arguably approached the necessary reasonable grounds for another cost-of-production investigation was the SCM research report. But that report was discredited and disregarded by the agency in prior proceedings. Hence, the plaintiff contends, it cannot now be equated with reason to suspect sales below cost of production. Plaintiff's Memorandum, pp. 63–65.

The defendant refers to *Connors Steel Company v. United States*, 2 CIT 242, 527 F.Supp 350 (1981); *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 575 F.Supp. 1277 (1983), *aff'd on other grounds*, 745 F.2d 632 (Fed.Cir.1984); and *Huffy Corp. v. United States*, 10 CIT 214, 632 F.Supp. 50 (1986), in support of its position that it

> can—and should—initiate a cost of production investigation when there is a timely, particularized allegation by the petitioner of sales below cost, but that the petitioner's allegation need not show substantial numbers of below-cost sales, just a reasonable basis to investigate.

Defendant's Memorandum at 35. Continuing, in this matter the

> domestic manufacturer, SCM, alleged below cost sales and produced calculations which showed that Nakajima was selling its PETs in the home market at below cost of production prices.... Consequently, Commerce reasonably concluded that it had reasonable grounds to believe or suspect that Nakajima's sales in the home market had been made at prices

which represented less than the cost of producing the merchandise in question.... *Id.* at 37–38 (citations omitted).

An agency has a duty, of course, to consider an allegation properly raised, and dispose of it one way or another. If proffered information provides a reasonable basis to believe the contention, the agency is obligated to attempt to confirm it through investigation. Under section 1677b(b), whether or not to follow up on an allegation of sales below cost hinges on the evidence submitted in support. *See, e.g., Monsanto Company v. United States*, 12 CIT ——, ——, 698 F.Supp. 285, 288–89 (1988). Because administrative pursuit of such a contention necessarily invades a foreign manufacturer's confidential, proprietary information, threshold justification is a delicate matter indeed, and careful consideration is required in order to avoid unwarranted disclosure. *Cf. Yale Materials Handling Corp. v. United States*, 11 CIT 822, 674 F.Supp 865 (1987).

While it has been held that, to justify a cost-of-production investigation, section 1677b(b) requires "only a showing that sales have been made at below cost, not substantial sales", such a showing, nonetheless, must be made. *Huffy Corp. v. United States*, 10 CIT at 222, 632 F.Supp. at 57–58. In *Al Tech Specialty Steel Corp. v. United States*, 6 CIT at 246–47, 575 F.Supp. at 1279–80, the court pointed to

> an instructive body of law stemming from the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), wherein courts have grappled with the slippery concept of "reasonable suspicion." The upshot has been the formulation of detailed guidelines for determining whether *vel non* such suspicion exists in a given case. The teaching of *Terry* and its progeny is that in order for reasonable suspicion to exist there must be "a particularized and objective basis for suspecting" the existence of certain proscribed behavior, taking into account the totality of the cir-

cumstances—the whole picture.[5]

In that case, the petitioner had presented the ITA with four pieces of information. Two of them, a foreign steel-industry press release and a European Commission paper, indicated that competitors in Europe, as a group, had incurred increases in raw-material and energy costs, but without increasing prices accordingly. The other two items were quotations from American trade papers characterizing the particular foreign producer as a "loss-making" operation. Taken as a whole, the court found that those items were too general in nature to tie the existence of loss in the foreign market to the specific merchandise under consideration, and it therefore upheld the ITA's perception that reasonable grounds were lacking for conduct of a cost investigation.

In *Connors Steel, supra,* the domestic petitioner had submitted (1) a trigger pricing mechanism showing sales of steel by the foreign manufacturer below the trigger price; (2) proof of its own costs of production in conjunction with its claim of approximately the same efficiency of production, which together tended to prove that the other manufacturer's sale price was below cost of production; and (3) a statement appearing in the foreign manufacturer's own annual report that on various occasions it had accepted orders at prices which did not cover even fixed costs. Nevertheless, Treasury declined to conduct a cost-of-production investigation. When the court considered the "whole picture", however, it disagreed that the petitioner's proffer had not provided reason to suspect sales below cost, and it therefore remanded for an investigation of the foreign costs of production.

In this case, the defendant argues that the fact that the ITA

> had determined that there were no sales below the cost of producing the relevant PETs during prior periods ... does not mean that Commerce had no reasonable

grounds to believe or suspect below cost sales during the period considered here. It is pertinent to note that in the previous periods foreign market value had been based on third country sales. This was the first review in which Commerce would rely upon home market sales for foreign market value, unless those sales were at prices below cost. Commerce, therefore, found it imperative to conduct a cost investigation.... If Commerce had again relied upon third country sales or had relied upon home market sales without pursuing well-documented allegations that the sales were at prices below the cost of production, it might not have been sufficiently diligent....

> ... SCM ... submitted particularized information dealing with Nakajima's PET models. That information was sufficient for Commerce to conclude that the elements required for the initiation of a cost of production investigation were present. The information did not have to establish that there in fact were below cost sales.

Defendant's Memorandum at 38–39 (footnote omitted).

However, consideration of such information should not occur in a vacuum but rather should encompass the whole picture the agency has acquired. Here, that picture included the information already garnered at the prior proceedings. The defendant allows that it investigated the same allegations during those proceedings without finding sales below cost. Of course, the relevance of those results for this case depends upon the circumstances of the ITA's decision to reinvestigate. *Cf. Ambassador Division of Florsheim Shoe v. United States,* 748 F.2d 1560 (Fed.Cir. 1984).

During the period under review, there had been an apparent increase in Nakajima's home-market sales from 4.6 to 6.6 percent of its total sales. The defendant claims it was "imperative" to conduct an

---

**5.** Footnote omitted; citing *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), and *United States v. Merritt,* 695 F.2d 1263, 1268 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). According to *Cortez,* the test is whether, based upon all the circumstances, an assessment of the "whole picture" yields a "particularized suspicion" about an individual's activities. 449 U.S. at 418, 101 S.Ct. at 695.

investigation of the company's costs of production in light of that "changed circumstance" according to the following rationale:

> ... Since in this review, the petitioner alleged below cost sales in the home market and there was evidence that, for the first time, there were sufficient home market sales upon which to base foreign market value, if the home market sales were at prices above the cost of production, Commerce decided to initiate a cost of production investigation.

Defendant's Memorandum, p. 32. On its face, this mixes sales and costs. The process of determining foreign-market value initially should involve instead consideration of sales *qua* sales—before the separate matter of cost comes into play.

■ Be that as it may, the ITA is expert in enforcing the statute and is presumed, moreover, to have considered all pertinent information sought to be brought to its attention. *E.g., Maine Potato Council v. United States*, 9 CIT 293, 301, 613 F.Supp. 1237, 1245, *appeal after remand*, 9 CIT 460, 617 F.Supp. 1088 (1985); *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F.Supp. 1318, 1326 (1984). But the court is in a position to determine if it has done so. *E.g., Floral Trade Council of Davis, California v. United States*, 13 CIT ——, ——, 709 F.Supp. 229, 230 (1989).

As indicated, in the end the agency relied on the market research report, ConfDoc 1, submitted unchanged since the second administrative review and comprised of 172 pages of tables, summary statistics and generalized information pertaining to the Japanese PET industry as a whole and to the member manufacturers under investigation, the plaintiff included. The report's authorship is not shown, even on the confidential version, and there is no attestation of veracity or other indication of independent objectivity. The confidential version provides a general description of the methodology used to derive the manufacturing cost calculations, but much of it is based upon derivation and analogy. *See, e.g., id.* at 146. The report is detailed, although the only source mentioned for its breakdown of Nakajima's costs of production is a "Sept. report '81", which is referenced in conjunction with certain estimates deriving average wages per worker. *See id.* at 23–24. Whether the 1981 report was one of that company's own, or from some other source, is unclear.

In any event, SCM's report does not seem to enhance the credence of the allegation of sales of Nakajima PETs below cost. In the middle are three examples of sales at home, and in the end is a listing of production costs for the models 7500 and 8800C. The difference between those alleged costs and the corresponding sales information reported is only sales above the cost of production. *Compare id.* at 101–02 *with id.* at 172. Indeed, the intervenor-defendant admits that "Smith Corona repeatedly emphasized that ... the market research report did not show below-cost sales of Nakajima's model 8800C." [6] Hence, the conclusion the petitioner pressed appears to have come from comparing the Nakajima sales data, as reported in its questionnaire response, with the costs of production asserted in the research report.

Whatever the comparison, during both the preceding and the instant reviews, the ITA had verified information on Nakajima [7] which conflicted with the data contained in the report, beclouding its import and calling into question the propriety of using that data. For example, if the stated materials costs are compared with the agency's own materials-cost information for the same period, reliability appears to vary inversely with the degree to which the report's cost data vary from the ITA's veri-

---

6. Memorandum of Smith Corona Corporation in Response to Plaintiff's Motion for Judgment, p. 50.

7. Thus, for example, the agency obtained verified information on materials costs through May 1981. *See* ConfDoc 113, Exhibit Z–3, Verification of 1980 "COP" For 8600, p. 5. Furthermore, the ITA's previous derivation of labor, general-selling and administrative costs during the preceeding review also allowed for extrapolation, absent significant changed circumstances.

fied or extrapolated information. Furthermore, when the report was submitted during the second administrative review, the petitioner indicated readiness to provide whatever source documentation the ITA requested. Such a request followed, but the petitioner was unable to supply that which the ITA deemed necessary, and the report was rejected as not sufficiently substantiated to justify further excursion into Nakajima's business per an agency letter in the record now before the court stating:

> ... On December 9, 1982, we notified you that the background and source information was inadequate and we requested further information. On December 30 ... you responded to our request. ... While the information presented on December 30 ... responds to certain questions, you did not comply with our request to furnish interview reports where the information was derived from interviews. Further, you did not supply the specific methodology and applicable data used to calculate the purchased parts amount for the model 7500.... It was imperative that this information be submitted before we could consider such market research report data, especially when the data was received at the point it was in this proceeding.

> In February 1982, before we conducted our on-site verification, we requested your input into verification preparations. On March 26, ... you requested that we investigate five points with respect to Nakajima's cost of production. [We] examined those points which would affect the cost of production. We found that Nakajima had no equity or other interest in its subcontractors, that no Nakajima employee acted as an advisor or consultant to its subcontractors and that Nakajima did not provide any assists to its subcontractors for over four years. Because the transactions between Nakajima and its subcontractors are arms length we did not contact any of the subcontractors. Finally, we are interested in actual labor costs, which we verified. In your pre-hearing and post-hearing briefs,

based on the market research report, you requested that we examine further points regarding Nakajima. Without the source documentation, we maintain that we do not have an adequate basis to do so.

> Moreover, we are satisfied that we adequately verified each element of Nakajima's cost of production and that all costs are included. In each instance, we looked to randomly selected source documents and we traced individual items back to Nakajima's Ministry of Finance report. Therefore, concerning SCM's allegation of sales by Nakajima to West Germany below its cost of production, we will not use SCM's data.

> \* \* \* \* \* \*

> In your December 30 ... submission, you disagree that we have any legitimate need for any further information on the methodology and sources used by the market research organization and you comment that our request places an onerous burden on domestic producers. We maintain that these requests for source and methodology information are necessary to provide a sufficient basis for continuing an investigation where, as mentioned above, we either conducted a verification or the information is presented late in the review. Moreover, we do not believe that such requests place an unnecessary burden on the domestic producer; the market research firm must have used the requested data in preparing the report and the preparers of the report should be fully capable of furnishing the requested material to the party contracting for the report. R.Doc 68 at 2–3.

### C

This letter properly states that an "unnecessary burden" had not been placed on the petitioner[8], and the record developed and now before the court does not reveal that the petitioner lived up to the burden it did have. *Cf. Huffy Corp. v. United States, supra.* What the record does reveal, in the final analysis, are home-market

---

**8.** *Cf. Bomont Industries v. United States,* 13 CIT ——, ——, 718 F.Supp. 958, 964 (1989) ("the provisions of the Trade Agreements Act of 1979 clearly express congressional intent that the administrative agency will obtain information through its own investigative efforts").

sales deemed by the ITA a sufficient basis for determination of foreign-market value under 19 U.S.C. § 1677b(a)(1)(A) and displeasure developed by the agency team during its brief visit to Nagano.

Of course, to believe or suspect is ephemeral and, according to the statute, for the mind of the administering authority. If differences between reasonable minds are not enough to reverse ITA perceptions in general, there is even less room for reversal when the difference is one of belief or suspicion. But the law does require *reasonable grounds* to believe or suspect, and this court cannot conclude that the record contains such grounds, particularly in view of the negative results of the ITA's investigations of the prior sales-below-cost allegations, including for the very year in question, and the absence of fresh information.

While the agency has broad discretion in the enforcement of the trade law, and its expertise is entitled to deference, more of a foundation had to have existed to satisfy the specific requirement, if not the spirit, of the governing statute. *Cf. Floral Trade Council of Davis, California v. United States,* 888 F.2d 1366, 1369–70 (Fed.Cir. 1989); *Monsanto Company v. United States,* 12 CIT at ——, 698 F.Supp. at 288–89. All the team actually had to go on in July 1985 to visit Nagano was old contention, which had been previously discredited. That was the moment of essence. The displeasure developed after arrival thus does not count any more than do the other issues raised in this matter subsequent thereto, including (1) whether the ITA, "having concluded that it was required by statute to use 'best information available,' erred by failing to use the 'best information' " [9] and (2) "[a]ssuming arguendo that a cost of production investigation was warranted, whether the Department's premature and unjustified termination of the second cost of production verification was arbitrary, capricious, and otherwise not in accordance with law". Plaintiff's Memorandum, p. 8.

### IV

The court need not and therefore does not express any opinion on those other points. Rather, the plaintiff has borne its burden of persuasion on the threshold issue discussed, with the necessary conclusion being that the ITA decision to investigate Nakajima's costs of production all over again in 1985 was not supported by substantial evidence on the record or otherwise in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B). Plaintiff's motion for judgment upon that record must therefore be granted in the part indicated, and this matter must be remanded to the agency for further proceedings not inconsistent with this opinion regarding the margin of dumping, if any, of plaintiff's merchandise for the period May 1, 1981 to April 30, 1982.

The ITA may have 90 days from the date hereof for such proceedings and to report the results thereof to the court, whereupon the plaintiff may have 30 days thereafter in which to respond, and the defendant and the intervenor-defendant may have 15 days to reply thereto.

So ordered.