**SMITH CORONA CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 88–11–00866.

United States Court of International Trade.

July 12, 1991.

---

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Todd C. Fineberg, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Jane E. Meehan, Office of the Chief Counsel for Import Admin., U.S.

Dept. of Commerce, Pamela A. Green, Washington, D.C., of counsel, for defendant.

Tanaka Ritger & Middleton, H. William Tanaka and Patrick F. O'Leary, Washington, D.C., for intervenor-defendants Bro. Industries, Ltd. and Brother Intern. Corp.

McDermott, Will & Emery, R. Sarah Compton and David J. Levine, Washington, D.C., for intervenor-defendant Nakajima All Co., Ltd.

## OPINION & ORDER

AQUILINO, Judge:

The plaintiff has interposed a motion for partial judgment on the record compiled by the International Trade Administration, U.S. Department of Commerce ("ITA") *sub nom. Portable Electric Typewriters From Japan Final Results of Antidumping Duty Administrative Review*, 53 Fed.Reg. 40,926 (Oct. 19, 1988). As indicated, the review was carried out under the aegis of an antidumping-duty order for portable electric typewriters ("PETs") from Japan [1] and covered the years May 21, 1982 to May 20, 1983, May 21, 1983 to May 20, 1984, May 21, 1984 to April 30, 1985, and May 1, 1985 to April 30, 1986. It resulted in dumping margins for those respective periods of 0.62, 0.32, 0.44 and 4.00 percent for PETs manufactured by Brother Industries, Ltd. ("BIL").

BIL and its subsidiary Brother International Corp. ("BIC") have been participants in those review proceedings and brought an action of their own, CIT No. 88–11–00860, challenging the results thereof. Their motion for judgment on the agency record, which has been partially resolved *sub nom. Brother Industries, Ltd. v. United States*, 15 CIT ——, Slip Op. 91–58 (July 12, 1991), caused the plaintiff to file its motion for partial judgment on the same record per the following rationale:

> ... In that action [No. 88–11–00860], both the defendant, International Trade Administration (ITA) and Smith Corona

have conceded that certain errors were committed in the underlying agency determination that require a remand. Accordingly, this motion for partial judgment on the agency record is addressed specifically to those issues that Smith Corona wishes to pursue concerning the determination with respect to Brother. Should this Court determine in this action, too, that ITA erred, Smith Corona believes that the most efficient approach would be to remand all issues from both court actions simultaneously for consideration by the agency.[2]

Those issues, as articulated in the motion, are:

1. Whether ITA's conclusion that advertising expenses incurred by Brother as the "Official Typewriter of the Olympic Games" were "devoted exclusively" to Brother's EM-series office typewriters was supported by substantial evidence?

2. Whether ITA applied an improper legal standard, unsupported by its own regulations and precedent?

3. Whether, even assuming that the "Official Typewriter of the Olympics" was limited to promotion of office typewriters, a portion of the advertising expenses should have been allocated to portable electric typewriters sold by office equipment dealers?

4. Whether pursuant to 19 U.S.C. § 1677e(b)(3) ITA should have verified the allegation by Brother that no expenses were incurred during the period under review with respect to Brother's sponsorship of the 1988 Olympic Games?

5. Whether ITA properly adjusted foreign market value and U.S. price on account of credit costs incurred by Brother in the U.S. market, where ITA relied upon annual average credit costs submitted by Brother notwithstanding that the record established that credit terms were higher than average during three discrete promotional periods each year and varied by customer and period?

---

1. *See* 45 Fed.Reg. 30,618 (May 9, 1980).

2. Plaintiff's Memorandum of Points and Authorities in Support of Partial Judgment on the Agency Record, p. 2, n. 2.

Jurisdiction of the court is pursuant to 28 U.S.C. § 1581(c).[3]

## I

■ This court may not substitute its own judgment for that of the ITA even though it could come justifiably to a different conclusion had the court the burden of reviewing the matter *de novo. Ipsco, Inc. v. United States,* 13 CIT ——, ——, 710 F.Supp. 1581, 1583 (1989), *aff'd in part, rev'd in part,* 899 F.2d 1192 (Fed.Cir.1990), citing *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986), and *American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco Inc. v. United States,* 760 F.2d 249 (Fed.Cir.1985). The standard of review is whether the agency determination is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). The record is to be reviewed for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

## A

Here, the ITA verified Brother questionnaire responses for the 1985–86 or sixth-review period. *See* Confidential Record Document ("ConfDoc") 110. Thereafter, the petitioner alluded anew [4] to possible benefits to Brother's U.S. PET sales arising out of the sponsorship of the Olympic games and requested further investigation as to effect upon domestic prices.[5] The ITA thereupon directed the petitioner's suggested questions on the matter to Brother. *See* R.Doc 379. *See also* R.Doc 349.

Brother's response indicated that it had acquired a license on April 27, 1982 from the Los Angeles Olympic Operating Committee ("LAOOC") to promote typewriters generally and worldwide. The plaintiff claims, nevertheless, that advertising expenses for the 1984 games began "accruing" as early as royalty payments made in January 1981.[6] In either event, after the license issued, Brother expended increasing amounts, using 1984 Olympics symbols, to promote typewriters in Japan and overseas, some of which [7] were accounted for in the

---

**3.** The plaintiff has offered to supplement its motion papers with oral argument, but the quality of those papers, and of those submitted in opposition, obviates any need for such further explication.

**4.** In *Portable Electric Typewriters From Japan; Final Results of Antidumping Duty Administrative Review,* 52 Fed.Reg. 1,504, 1,509 (Jan. 14, 1987), the ITA had determined that, insofar as U.S. sales of Brother's PETs were concerned, 1984 Olympics sponsorship expenses were "devoted exclusively" to products outside the scope of the antidumping duty order, namely, Brother office typewriters. Smith Corona claims to have challenged that finding in CIT No. 87–10–00157 but then to have abandoned the issue due to the insignificant amount of Olympics advertising expenses incurred by Brother during the period under review; "however, it does not concede that the determination by ITA was correct." Plaintiff's Memorandum, p. 6, n. 3.

**5.** Record Document ("R.Doc") 340. *See also* ConfDoc 125. Section 1677a(e)(2) of Title 19, U.S.C. requires that exporter's sales prices be reduced for "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise". The governing regulation states that adjustments for differences in the

circumstances of sales in the comparative markets will be allowed

> to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration. … Examples … [include the] assumption by a seller of a purchaser's advertising or other selling costs.… Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise.…

19 C.F.R. § 353.15(a) and (b) (1988).

**6.** Plaintiff's Memorandum, p. 36, citing R.Doc 392, Attachment 5, answer to question 1.

**7.** Specifically, they were for donations of manual and office typewriters to LAOOC, royalties, television commercials, promotional items, customer entertainment, and the operation of a press center and promotional booth. The promotional items, which were distributed worldwide, consisted of stickers, paper bags, envelopes, wrapping paper, T-shirts, "trump

pricing of PETs sold in the United States. That accounting is not being challenged here. However, the response also indicated that BIL did not include newspaper, magazine and billboard advertising expenses in calculating costs allocable to U.S. PET sales

> since all magazine, newspaper and billboard advertisements depict an EM series office typewriter. As such these advertisements are not generic office typewriter advertisements and, according to the policy enunciated during the December 14, 1987 meeting, not allocable to [those] sales....
>
> We advertise "Electronic Office Typewriters" with the Olympic Mark both in the U.S. and Japan. Samples of all types of Olympic advertisements are attached. These advertisements are inserted in magazine[s], newspaper[s], etc. in order to promote our electronic office typewriters.

ConfDoc 132, pp. 19, n. 1 and 20.

Prior to publication of the preliminary results, the petitioner argued that the 1984 Olympics advertising expenses were "attributable to typewriters used in offices and, as such, should be allocated *at a minimum* to sales of all typewriters sold by Brother for use in the office including the so-called 'compact office' PETs within the scope of the antidumping duty order." ConfDoc 134, p. 7 (emphasis in original). Apparently, the preliminary results included ITA agreement in the form of an adjustment to the exporter's sales prices of certain PET models sold through office equipment dealers. At the subsequent hearing, the petitioner argued, among other things,

that expenses for all advertisements displaying "Official Typewriter of the Olympics" should be allocated to all sales. Brother countered that the 1984 Olympics advertising was not related to PETs but to other products and that deduction of the expenses would be contrary to agency practice in other proceedings[8] and also "an abrupt reversal" of the treatment of those expenses in the preceding review determination. The contention apparently proved convincing, as the ITA explained:

> ... We disregard advertising expenses when such expenses *are incurred exclusively* for models outside the scope of that order. In the previous review, we determined that Brother's 1984 Olympic advertising campaign was devoted exclusively to Brother's EM-series office machines. SCM has not submitted convincing evidence that Brother's PET models directly benefited from the Olympic advertisements. Furthermore, it would be inappropriate to allocated [*sic*] some of these expenses, which have been determined to be attributable to Brother's office typewriters, to PET models simply because they are sold through OEDs. We consider the advertising to be related to particular products, not to a particular channel of distribution.[9]

### B

■ The plaintiff restates the facts of record now at length. In question are eight styles of advertisement[10] which were run in magazines and newspapers and on a billboard in New York City's Times Square, copies of which have been appended to

---

cards", tie-pins and stuffed dolls bearing the Olympics logo.

**8.** 53 Fed.Reg. at 40,927, citing *Color Picture Tubes From Japan,* 52 Fed.Reg. 44,171 (Nov. 18, 1987); *Television Receiving Sets, Monochrome and Color, From Japan,* 50 Fed.Reg. 24,278 (June 10, 1985); *Color Television Receivers From Korea,* 49 Fed.Reg. 50,420 (Dec. 28, 1984).

**9.** 53 Fed.Reg. at 40,927 (emphasis added). "OED" was said to be an acronym for Brother's office equipment division. However, the parties' papers relate the reference to "office equipment dealer(s)", a usage to which this opinion will defer.

**10.** Brother apparently submitted six styles which were published in U.S. newspapers and magazines in response to the ITA's supplemental inquiry. Two other styles were also identified by the petitioner during the review proceeding. *See* Plaintiff's Memorandum, p. 8, citing R.Doc 340, Exhibit 5. Hereinafter, the first six advertisements will be referenced as indicated in plaintiff's memorandum *viz.* "Pattern 1", "Pattern 2", etc., and the two advertisements in Appendix 2 to that memorandum will be referenced as "Pattern 7" and "Pattern 8".

plaintiff's memorandum. The billboard depicted an EM–200 electronic typewriter frontally along with the words "Official Typewriter of the 1984 Olympic Games". The magazines and newspapers printed large-type messages a la

"To strive towards excellence. To attain it. That's the spirit of the gold ... and that's the spirit behind Brother" [Pattern 3];

"History in the Making" [Pattern 7];

"Gear–Up For The Olympics With Brother" [Pattern 8];

"*brother* IS BETTER" [Pattern 6];

"If it's the 'Official Typewriter of the Los Angeles 1984 Olympic Games' you know its quality, you know it's *brother*" [Pattern 1].

Most of these proclamations contained further blandishment in smaller-print, from which the plaintiff quotes the following:

"Brother has justifiably been designated the official typewriter of the 1984 Los Angeles Olympic Games."

"Brother strove towards excellence ... and attained it." [Pattern 3]

"The Olympics. For centuries the world's finest have periodically gathered for intense competition.... The Brother EM–200. Proudly taking its place among the best of the world as the official typewriter of the Los Angeles Olympic Games." [Pattern 7]

"It's a fact ... Brother is better."

"No comparable typewriters provide more quality, features and value." [Pattern 6]

"We could go on but our title says it all: 'Official Typewriter of the Los Angeles Olympic Games.'" [Pattern 1]

Plaintiff's Memorandum, p. 19.

Such statements, the plaintiff contends, indicate that "an equally important theme" apart from promotion of the EM-series "was Brother's sponsorship of the Olympics—its status as a corporate 'good citizen.'" *Id.* at 17. It argues that promotion of the EM-series was actually the elevation of a "flagship" of an entire product line and that Brother's sponsorship extended to all of its machines, PETs as well as office typewriters. The plaintiff points to Brother's brochure commemorating its 50th anniversary and stating: "We're very proud and happy that *our typewriters* were chosen as the 'Official Typewriter of 1984 Olympics'". *Id.* at 16–17, citing R.Doc 340, Exhibit 2 (emphasis added by plaintiff). It also relates excerpts from a number of authors on marketing to the effect that featuring a top-of-the-line product in advertising is a common method of promoting the entire line. The plaintiff claims that Brother was a recent entrant into the electronic office-typewriter market but had an established name for PETs; that the office typewriters are substantially similar to PETs in appearance, functions and features, all of which comprise one line of product; and that, in at least one instance of PET-specific advertising, the style used was identical to that of an Olympic advertisement which the ITA allegedly determined was devoted to an EM office typewriter, albeit without Olympic symbols. Additionally, the plaintiff asserts that the advertisements were placed in "nationwide mass media" like *Time, Newsweek, Sports Illustrated, Cosmopolitan, Los Angeles '84* and *Penthouse;* in 1982, seven of 20 advertisements were run in August and September coincident "with the traditional promotion of portable electric typewriters for back-to-school"[11]; in 1983, nine of 31 were run in those months; and, while Brother reported advertisements only through May 1984, the plaintiff discovered three (in two styles) which appeared in August and September of that year. *Id.* at 21, citing R.Doc 340 at Exhibit 5. "The other period in which Brother's advertising clustered was April–May, another major marketing season for portable electric typewriters: 'Graduation/Father's Day.'" *Id.* at 21. Finally, the plaintiff claims that the 1984 Olympic symbols were placed in proximity to PETs as part of point-of-purchase displays[12] and refers to its submission be-

---

11. Plaintiff's Memorandum, p. 21, citing R.Doc 340 at Exhibit 5.

12. *Id.* at 22. It reproduces a picture appearing in Brother's 50th anniversary commemorative booklet apparently taken at a Los Angeles show-

fore the ITA containing the transcript of a commercial in which a dealer asserted that it

> featur[ed] the complete line of Brother Typewriters, the official typewriter of the Olympics. On display the state of the art Brother EM200, the typewriter that remembers. No comparable unit provides more quality and features. It's [*sic*] sixteen character display allows you to edit while you type, and the Brother EM200 interfaces easily with most computers.[13]

### C

To the extent that the plaintiff argues that such advertisements were corporate imaging, *Brothers Industries, Ltd. v. United States*, 3 CIT 125, 540 F.Supp. 1341 (1982), *aff'd*, 713 F.2d 1568 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), appears to be on point. Involving the same parties as this action, Smith Corona contested in that proceeding an adjustment to foreign-market value because "some of the advertisements made reference to Brother's commemoration of the production of its ten millionth typewriter, and therefore such advertisements were merely promoting Brother's corporate image." 3 CIT at 152, 540 F.Supp. at 1365–66. However, the Court of International Trade agreed with the ITA that

> those references do not constitute merely a "general image campaign", as urged by SCM.... [E]ach of the advertisements in question refers specifically to Brother's typewriters, either by words or by actual pictures. A "general image campaign", on the other hand, is more in the nature of making consumers aware of the company's concern for consumers

and the quality of its workmanship and product in general, but does not tout a specific product. Where, as here, the particular product in question (*i.e.*, typewriters) is the sole subject of the advertisement, such advertisement does not lose its direct relationship to the sales of the product under consideration.

3 CIT at 152, 540 F.Supp. at 1366 (footnote omitted). In affirming, the court of appeals stated, 713 F.2d at 1581:

> ... While the challenged ads were not exclusively directed to the relevant merchandise, a portion of each advertising effort was. In a purely metaphysical sense, Smith–Corona is correct in that the ad expense cannot be directly correlated with specific sales. Yet, the statute does not deal in imponderables.
>
> That portion of the advertising that featured portable electric typewriters was related to the expense of selling that merchandise. The presence of ... institutional advertising in the same advertisement does not deprive the relevant portion of the advertisement of its direct relationship to the relevant sales.
>
> ... In the absence of evidence to the contrary, the Secretary could reasonably conclude that the advertising expense was related to sales during the relevant period. Thus, we must uphold the Secretary.

Unlike the action at bar, the ITA had made the adjustment requested therein, despite Smith Corona's arguments to the contrary. Although the setting here is the reverse, the foregoing case governs. Even if the evidence that the advertisements contained institutional or corporate-image themes were substantial, it still would not undermine the agency's determination, for the existence of such themes in advertise-

---

room. *See id.*, Appendix 3, p. 7. Positioned around the showroom were typewriters, one of which was situated beneath a poster bearing the Olympic symbols. That display, the plaintiff claims, is of a portable electric typewriter, although the picture is ill-defined. The plaintiff also points to a May 6, 1983 New York Times article (page D1) with photograph encaptioned "salesman at 47th Street Photo in Manhattan, demonstrating a Brother electronic typewriter" to another individual. The demonstration is

taking place on a countertop which bears two point-of-purchase displays depicting the Olympic symbols and "Electronic Office Typewriters". *See id.*, Appendix 4.

**13.** R.Doc 340, Exhibit 4. This exhibit bears the letterhead "Radio TV Reports, Inc." and other information pertaining to what appears to have been an actual broadcast.

ments does not necessarily diminish direct promotion therein of particular product(s).

### D

■ Another point the plaintiff presses is that the ITA determination allows the costs of the advertisements to circumvent the antidumping-duty order in that they promoted electronic typewriters generally.

It may well be that the ambit of such an order is ill-defined in terms of the marketplace. However, that is not the perspective of the court; the agency evaluation of the distinctions in that setting can only be reviewed on the basis of the record developed. And the ITA is presumed to have given appropriate consideration to everything brought to its attention and relevant to the issue. *See, e.g., Nakajima All Co., Ltd. v. United States,* 14 CIT ——, ——, 744 F.Supp. 1168, 1175 (1990); *Maine Potato Council v. United States,* 9 CIT 293, 301, 613 F.Supp. 1237, 1245, *appeal after remand,* 9 CIT 460, 617 F.Supp. 1088 (1985).

Here, the agency concluded that the expenses for the advertisements and displays were "incurred exclusively" [14] for the promotion of office electronic typewriters and not for an entire product line. The defendant now adds:

> According to consistent agency practice, Commerce considers expenses for corporate advertising which is model-specific as expenses directly related to that product only ("directly related" expenses).... In this case, Commerce properly did not make an adjustment for the advertisements because they referred *only* to products which are not covered by the review—electronic office typewriters.

Defendant's Response, pp. 14–15 (emphasis in original).

According to the plaintiff, several advertisements did not mention the "EM–series" at all. However, of the eight in the record, only pattern 3 might be construed to support this allegation. Even then, it features a picture of three electronic typewriters

with *"brother* Electronic Office Typewriters" centered below the picture in the largest type on the page. In regard to plaintiff's particular list of publications in which the advertisements appeared, the attempted inference is that their aim was at potential consumers of PETs. However, readers could just as readily have included potential purchasers of office machines. For instance, *The Office, PanAm Clipper, USAir Magazine, The Officer Magazine* and *The Office Technology* are publications in which the advertisements appeared and about which little mention is made. *See, e.g.,* ConfDoc 132. Furthermore, although the appearance of one-third of the announcements during one-sixth of the year under consideration may be statistically significant, there is nothing in the record from which to infer that office-equipment sales were unrelated to those periods.

The defendant claims that the "plaintiff ignores the logical reason for the timing of the Olympic advertisements—the Olympics Games occurred in late summer, 1984." Defendant's Response, p. 17. As the ITA decided, even if use of the Olympic symbols was cavalier, any benefits to PETs were, at best, tangential. The New York Times article, for example, discussed Brother's attempts to break into "the office market in the United States", the competitive environment for producing office typewriters, and the company's "growth in the office automation lines."

There is substantial evidence on the record in support of the agency's position. Each advertisement contained "Official Typewriter of the Los Angeles 1984 Olympic Games" juxtaposed with one or more of the games' symbols and prominently featured the name "brother" in bold lettering, followed usually by the words "Electronic Office Typewriter" or "Electronic Office Typewriters" in proximity to a picture of one or more such machines. The model number of the one pictured was captioned on the side, invariably indicating the EM series, and/or a serial plate containing "EM" was visible above the keyboard. Most of the advertisements went into detail

---

**14.** 53 Fed.Reg. at 40,927.

about particular features of the pictured machine(s) or the EM series generally. As for the billboard with the "Official Typewriter of the 1984 Olympics" language and symbols, the photograph submission upon which the ITA based its decision depicted an electronic typewriter frontally, the serial plate ("EM–200") of which was visible. In short, to have concluded that the exhibits were intended to promote electronic office typewriters exclusively is not without foundation.

The plaintiff contends nonetheless that the ITA reversed the burden of proof by requiring it to submit "convincing evidence that Brother's PET models directly benefited from the Olympic advertisements." Plaintiff's Memorandum, p. 28, quoting 53 Fed.Reg. at 40,927. In essence, it argues that the evidence of whether such advertisements benefited PETs was more likely in the respondents' hands, and they, not the petitioner, should have been required to disprove any benefit to PETs.

In weighing the information presented on both sides, the agency simply accepted the respondents' presentation as against that of the petitioner. This did not amount to an unlawful approach. Indeed, as the plaintiff itself states, "it would be difficult to show that an advertisement was actually a 'direct benefit' to sales of the merchandise advertised." *Id.* at 30. *Cf. Smith–Corona Group, Consumer Products Div., SCM Corp. v. United States,* 713 F.2d at 1581 ("In a purely metaphysical sense ... the ad expense cannot be directly correlated with specific sales").

### E

■ The plaintiff also takes the position that a portion of the advertising expenses should have been allocated to PETs sold by office equipment dealers. The defendant claims that "[a]ny adjustment based upon an alleged 'spillover' effect from advertisements featuring only Brother electronic office typewriters (as opposed to PETs) would be based upon pure speculation." Defendant's Response, p. 18. Of course, such speculation cannot be the basis for adjustment. *Compare, e.g.,* 19 C.F.R.

§ 353.15(b) (1988) (circumstance-of-sale adjustment not allowed unless "costs are attributable to a later sale of the merchandise") *with* 19 C.F.R. § 353.15(a) (1988) (adjustments allowed if there is a "direct relationship to the sales which are under consideration"). *But see* 19 C.F.R. § 353.56 (1990). Be that as it may, on the record at hand, the court is unable to conclude that the ITA was required to make the allocation requested. That is, its refusal was in accordance with law and based on substantial evidence in the record.

### II

■ The ITA verified the Brother responses to the general sixth-review-period questionnaires from March 2 to 13, 1987 pursuant to request and as required by 19 U.S.C. § 1677e. Thereafter, the petitioner repeated concern about Brother's advertising expenses in conjunction with the 1988 Olympics, and the ITA considered the matter of sufficient import to issue supplemental questions. The Brother response indicated that those games might involve PET–related advertising but claimed that the agreement to act as sponsor for 1988 was not concluded until March 31, 1987, and therefore no advertising expenses had been incurred in the period under review. The petitioner requested further verification. R.Docs 403, 410. The ITA declined, accepting Brother's claim, finding nothing suspect about it in itself and in light of the prior verification report(s) for BIC and BIL. *See* ConfDoc 151. The agency's final determination states:

> ... The advertising expenses for this campaign will be considered in administrative reviews for subsequent periods. We are satisfied that Brother did not begin incurring the expenses until after the close of the period under review.

53 Fed.Reg. at 40,928.

### A

The plaintiff argues that Brother's claim with regard to the sixth-review period is "unverified information ... not substantiated by a copy of the agreement, and represents a bare, self-serving assertion that

ITA should have given little weight." Plaintiff's Memorandum, p. 36. It contends that the ITA should have used the best information otherwise available or, at a minimum, verified the claim.

Brother asserts that the request to verify 1988 Olympics advertising was not only untimely, it was also so vague as to constitute a failure to exhaust administrative remedies. Allegedly, the petitioner initially requested only that the ITA explore "new issues" related to Olympics advertising in general and thereafter concentrated its requests for verification on Brother's 1984 expenses:

> ... Not a word was said about the 1988 Olympic Games expenses[.] ... Smith Corona failed to ever raise non-verification of the March 31, 1987 [contract] date as an issue, failed to provide the ITA with the opportunity to make the first decision thereon, and failed to exhaust administrative remedies.

Brother Memorandum, p. 30.

However, the petitioner's October 9, 1987 submission did request an investigation of "all costs of sponsorship for both the 1984 and 1988 Olympics"[15] and also "that the agency verify all data submitted by Brother in response to this request."[16] That request was not so vague that the ITA was not presented with a proper opportunity to address the issue. The petitioner pointed out that: (1) Brother made royalty payments for 1984 Olympics sponsorship in January 1981 or prior to its official agreement with the LAOOC[17]; (2) for subsequent review proceedings Brother submitted sample advertisements of its sponsorship of both the summer and winter 1988 games depicting "manual compact electronic ... [and] electronic office" typewriters[18]; (3) BIC reported that it had destroyed the promotional and advertising materials because they required too much space to store[19]; (4) Brother failed to re-

port the two different styles of advertisements discussed above; and (5) Brother submitted an incomplete listing of purchase-price sales and subsequently tendered additional data untimely[20]. The Brother response, *id.* at 32–33, is that three of these points have

> nothing to do with errors or omissions [and] in no way detract from Brother's reliability or credibility. The two other items ... deal respectively with 1984 Olympic advertisements and BIC's 1984–1985 purchase price sales. Smith Corona has not shown how these two isolated mistakes, unrelated to the March 31, 1987 date, create any doubt about the accuracy thereof.

Of course, the ITA must consider the record as a whole, including the results of any prior reviews which might bear on a present issue. *See, e.g., Nakajima All Co., Ltd. v. United States, supra.* The defendant asserts that, having already engaged in verification, it "was not required to conduct a second verification in order to verify the supplemental response." Defendant's Response, p. 22. Certainly, Congress intended to lessen the ITA's administrative burden by eliminating through section 618 of the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 3038, repetitive verification. Nevertheless, defendant's assertion conflicts with the plain language of the statute. Verification of all information relied upon in making a review determination is required by 19 U.S.C. § 1677e, and there is no dispute that the agency's determination relied upon the claimed lack of 1988 Olympics sponsorship expenses. While it is true, as the defendant points out, that the petitioner requested Commerce to verify the supplemental response almost one year after verification of the 1985–86 review period had taken place, the record exhibits an opportunity to have done so which should have been pursued.

15. R.Doc 349 at 2.

16. *Id.* at 3.

17. *See* R.Doc 392 at Attachment 5, answer to question 1.

18. *See id.* at Attachment 6.

19. *See id.* at Attachment 7, p. 6.

20. *See* Plaintiff's Memorandum, pp. 37–38 and R.Doc 428.

Verification tests the facts upon which conclusions are to be drawn and indicates whether they will reflect an acceptable degree of certainty. The defendant argues that to order verification in this case "would deprive Commerce of its discretion to determine the amount of information which is adequate and sufficient for the purposes of the particular proceeding and would place an extreme burden upon the agency's resources." Defendant's Response, p. 24. Suffice it to state for the present that neither the ability of the agency to choose that which will satisfy it on the facts nor the limits of its resources are in doubt, only that the ITA does have a statutory obligation to properly verify those facts which it finds dispositive.[21]

### B

Verification can be accomplished by various methods. The agency argues that it substantiated Brother's claim by noting the absence of conflicting information in prior verification of BIL's reported advertising and indirect expenses. Under such a circumstance, it argues, further verification was unnecessary, citing *Monsanto Co. v. United States*, 12 CIT 937, 947, 698 F.Supp. 275, 283 (1988) (the ITA has "some latitude not to comply with all requests to investigate further").

The plaintiff contends that the ITA's reliance on the general verification reports for BIL and BIC for the sixth-review period was misplaced. It argues that the BIC report was irrelevant because the concern is costs incurred by BIL on behalf of U.S. customers. As to verification of the latter's responses, the plaintiff avers that the

focus of the agency was advertising expenditures for the Japanese market, not the United States, and that the ITA merely accepted what Brother presented.[22] For similar reasons, it argues that relying on the verification of BIL's indirect expense claim would not cover satisfactorily the subject of the 1988 Olympics because that claim concerned allocations to home-market sales and was verified by tracing through BIL's allocation method certain payroll figures "to a sales statistics chart and to the Brother Sales Ltd. financial report". Plaintiff's Reply, p. 12, quoting from R.Doc 272, p. 16. The plaintiff argues that the determination does not adequately confirm that no 1988 Olympic games advertising expenses were incurred.

On both counts the court concurs. The ITA's verification of BIL indeed was concerned with the claim for advertising expenses in Japan, not the United States. The report on BIL is substantial evidence in support of the determination that the expenses claimed were actually incurred, but the methodology used did not prove that the universe of data examined would have necessarily included advertising in the United States. Similarly, the verification report of Brother's claimed indirect expense allocation to home-market models represents substantial evidence that the expenses claimed had been properly allocated, but the methodology followed does not appear to have been comprehensive enough to have confirmed that no such expenses were incurred by BIL. Although the parties do not dispute that 1988 Olympics advertising expenses would have appeared as inconsistencies in a comprehensive tracing of the claimed allocation of indirect expenses, the

---

**21.** *Cf.* H.R.Rep. No. 98–725, 98th Cong., 2d Sess. 43 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4910, 5170 ("The Committee ... believes it essential to proper enforcement of the laws that information used in determining annually the actual amount of any ... antidumping duty to be assessed under outstanding orders is accurate to the extent possible. At the same time, the Committee is concerned that requiring verification in every review would result in an unnecessary additional administrative burden on the Department of Commerce for perfunctory verifications. Therefore, verification would not be required if an interested party does not request it in a timely manner, or after recent

verifications have taken place unless shown to be warranted").

**22.** Plaintiff's Reply, p. 9. *See generally* BIL 1985–86 verification exhibits 224–243. The plaintiff continues: "Because each of the advertisements identified included a specific model portable electric typewriter (and none of the advertisements included the EM-series machines) ITA obviously did not verify Brother's advertising expenses with respect to its Olympic sponsorship promotion or its generic image advertising." *Id.* at 11.

verification relied upon was that of expenses incurred by Brother Sales Limited ("BSL"), not BIL. Furthermore, there is no indication that the advertising necessarily would have been BSL's responsibility.

In sum, the ITA stated that, based on the verification reports, it uncovered "no inconsistencies" to indicate that 1988 Olympic advertising expenses had been incurred, but, then again, it would not have, for evidence to that effect, if any, had to have been sought elsewhere.

### III

■ The plaintiff also complains that the ITA's acceptance of Brother's averaging of credit costs was unrepresentative of the transactions under investigation. During the review proceedings, the petitioner argued that Brother had on hand actual credit information for each customer and requested that credit expense calculations be based on such data rather than on the company's method of averaging. Brother contended that the ITA had permitted averaging of credit costs in the past and that it would have been an impossible task to report transaction-specific payment periods since they were linked to invoices and not to particular products. The agency determined, "as in the prior review, that the use of averaged collection periods is reasonable." 53 Fed.Reg. at 40,298.

Section 620 of the Trade and Tariff Act of 1984 amended 19 U.S.C. § 1677f–1 to provide, in pertinent part:

(a) In general

For the purpose of determining United States price or foreign market value ... and for the purposes of carrying out annual reviews ..., the administering authority may ... use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required....

(b) Selection of samples and averages

The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

Sampling is thus considered a reasonable expedient when the ITA is faced with a large number of transactions or adjustments. *See* H.R.Rep. No. 98–725, 98th Cong., 2d Sess. 45–46 (1984). To be "representative" of actual transactions and thereby comport with the statute, sampling should reach essentially the same result as transaction-by-transaction analysis.

The record shows that the ITA allowed the calculation of credit expense costs applying the formula $d/365 \times i \times$ unit price, where $d$ represented the number of days of credit extended and $i$ the daily rate of interest. *See* R.Doc 548, p. 11. The agency "used actual accounts receivable data to calculate average payment time and used this information to compute credit expenses on an annual basis". Defendant's Response, pp. 30–31, citing ConfDoc 110.

The plaintiff claims that "averaging has a distortive effect on calculations of the dumping margin when sales occur seasonally in peak promotional periods." Plaintiff's Motion for Partial Judgment, p. 2. Referring to "reports regarding pricing conditions in the U.S. market[ ] recorded by Smith Corona's sales personnel in the ordinary course of business", the plaintiff argues that "Brother would provide terms of *up to* 150 days on sales to specific customers during promotional periods", which, it claims, is proof that the averaging of credit costs skewed the dumping margins. Plaintiff's Memorandum, p. 43 (emphasis added). If $d$ equalled 150 days, the plaintiff finds that the real cost of credit to be more than twice as high as that accepted by the ITA. It refers to *Serampore Industries Pvt. Ltd. v. U.S. Dep't of Commerce*, 11 CIT 866, 874, 675 F.Supp. 1354, 1361 (1987), to imply endorsement of transaction analysis and contends that *Certain Stainless Steel Cooking Ware From Korea*, 51 Fed.Reg. 42,873 (Nov. 26, 1986), *amended*, 51 Fed. Reg. 46,883 (Dec. 29, 1986), *Certain Tapered Journal Roller Bearings and Parts Thereof From Italy*, 49 Fed.Reg. 2,278 (Jan. 19, 1984), and other determinations indicate that the agency's preferred approach is to use actual credit costs as the

basis for adjustment. The plaintiff quotes *Light–Walled Welded Rectangular Carbon Steel Tubing From Taiwan,* 54 Fed. Reg. 5,532, 5,536 (Feb. 3, 1989), in which the ITA, confronted with a request to use average credit costs allegedly due to inability to distinguish which sales were made on credit and which were not, stated that "the use of any average expense for all sales would have been highly distortive." Plaintiff's Memorandum, p. 47.

These references of the plaintiff do not lend sufficient support. *Serampore Industries* merely clarified that it may be proper to exclude from the universe of data to be analyzed items the inclusion of which the ITA concludes would be distortive. That case is not dispositive of whether or not the sample or average here was unrepresentative. Similarly, *Cooking Ware, Roller Bearings* and *Carbon Steel* do not indicate that sampling would not be more practicable and non-distortive—and hence preferred—under particular circumstances. The defendant admits that "the *preferred* method of calculating credit costs adjustment is by using a transaction-by-transaction method." Defendant's Response, p. 28 (emphasis in original), citing *N.A.R., S.p.A. v. United States,* 13 CIT ——, ——, 707 F.Supp. 553, 558 (1989). However, this preference is not legally compelled, only when it is shown that alternative sampling was unrepresentative or otherwise distortive of the results. Of course, care must be used in sample selection, but, as the defendant states here, while "the number of sales of Brother's PETs increased during certain periods during the year, there is no evidence that the terms of payment were any longer or more favorable to a U.S. purchaser for PETs purchased during a peak selling period." Defendant's Response, p. 31, n. 15. Nor is there any showing that the sample chosen was otherwise distortive. Merely because a party has transaction-by-transaction data available is not reason, in itself, to order its production.

### IV

In view of the foregoing, plaintiff's motion for partial judgment on the agency record is granted to the extent that this matter is remanded to the ITA to verify whether 1988 Olympic games advertising expenses were incurred by Brother during the 1985–86 administrative review period. The agency may have 60 days from the date hereof to comply with the remand and report the results thereof to the court, whereupon the plaintiff may have 30 days thereafter in which to respond, and the defendant and the intervenor-defendants may have 15 days to reply thereto.

In all other respects, plaintiff's motion for partial judgment on the agency record must be, and it hereby is, denied.

So ordered.