Slip Op. 03 - 110

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| | : | |
| CORUS ENGINEERING STEELS LTD.; <br> CORUS GROUP PLC; and <br> CORUS AMERICA, INC. | : <br> : <br> : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| UNITED STATES, | : | Court No. 02-00283 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| CARPENTER TECHNOLOGY CORP.; <br> CRUCIBLE SPECIALTIES METALS DIV. <br> CRUCIBLE METALS CORP.; <br> ELECTROALLOY CORP.; SLATER STEELS <br> CORP., FORT WAYNE SPECIALTY ALLOYS <br> DIVISION; and THE UNITED STEEL <br> WORKERS OF AMERICA, AFL-CIO/CLC, | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[Plaintiffs argued error in the determination of the margin in an antidumping duty investigation; CIT Rule 56.2 motion denied, judgment for defendant.]

Decided: August 27, 2003

*Davis & Leiman P.C.*, Washington D.C. (*Mark D. Davis*), for the plaintiffs.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*A. David Lafer*, *David S. Silverbrand*); Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*James K. Lockett*), of counsel, for the defendant.

*Collier Shannon Scott, PLLC,* (*Robin H. Gilbert*), Washington, D.C., for the defendant-intervenors.

# OPINION

The plaintiffs (collectively "Corus") appeal certain aspects of an antidumping investigation conducted by the International Trade Administration of the United States Department of Commerce ("Commerce"or "the Department") and published *sub nom. Notice of Final Determination of Sale at Less Than Fair Value: Stainless Steel Bar From the United Kingdom*, 67 Fed. Reg. 3146, PDoc[1] 162 (Jan. 23, 2002) ("*Final Determination*").  *See* PDoc 157 (unpublished version).  Corus moves for remand pursuant to CIT Rule 56.2 and argues that the determination is unsupported by substantial evidence on the record because Commerce denied allowance of "CEP offset," "zeroed" all negative margins for individual transactions, and included certain mill closing and other restructuring expenses unrelated to the cost of producing the foreign like product.  The government and the defendant-intervenors argue that the final determination should be sustained.  On the reasoning below, the Court sustains the results of the *Final Determination* with respect to Corus.

## *Background*

On December 28, 2000, the defendant-intervenors ("petitioners") filed a dumping allegation with Commerce against stainless steel bar ("SSB") from countries including the United Kingdom. CDoc 1.  When such a petition is filed, Commerce is required to determine whether imported merchandise is being or is likely to be sold in the United States at less than its fair value, *i.e.*, the amount by which the price charged for subject merchandise in the home or other comparative market (the "normal value") ("NV") exceeds the price charged for subject merchandise in the United States (the "U.S. price").  19 U.S.C. §§ 1673(1), 1677(35).  The investigation into the petition was initiated

---

[1]  The public and proprietary documents of the administrative record are herein referenced "PDoc" and "CDoc," respectively.

January 2, 2001.  *Notice of Initiation of Antidumping Duty Investigations: Stainless Steel Bar from France, Germany, Italy, Korea, Taiwan, and the United Kingdom*, 66 Fed. Reg. 7620, PDoc 17 (Jan. 24, 2001).  Commerce selected the three largest producers/exporters of SSB from the United Kingdom as mandatory respondents.  *See* PDoc 31.  On February 20, 2001, Commerce sent antidumping duty questionnaires to each concerning their respective SSB sales in the U.S. and the U.K. over the period October 1, 1999 to September 30, 2000 (the "POI").  PDoc 38.

Corus responded to the questionnaire between March and June 2001.  The response shows Corus Group plc, formerly British Steel, is engaged in the manufacture, processing, and distribution of various steel and other metal products and encompasses numerous companies, including Corus Engineering Steels Ltd. ("CES"), located in Rotherham, South Yorkshire, which is engaged in the manufacture and export of steel products including SSB.  *See* PDoc 55, CDoc 9 (CES Section A response), at A-4 to A-10 & Ex. 2.  For the POI, Corus reported that it sold subject merchandise through two U.S. affiliates, Corus America, Inc. ("CAI") and Avesta Sheffield Bar Company ("ASB"),[2] that all of its U.S. sales were at the "constructed export price" ("CEP") level of trade ("LOT"), and that all of its home market sales were direct via CES either to end-users or to "stockholders" (distributors).  Corus therefore claimed that all of its home market sales were at a more advanced LOT than its U.S. sales.  Corus further indicated that a LOT adjustment could not be calculated and therefore requested Commerce to make a CEP offset adjustment.  *See* PDoc 61 at B-24.  As part of its proof, Corus submitted a "selling functions table" reflecting *inter alia* the degree of selling activity for CES with respect to the U.K. and U.S. markets.  PDoc 86, CDoc 26, Ex. B16.

---

[2]  *See* PDoc 55, CDoc 9, at A-5 to A-6.  CAI imports and sells steel products manufactured by CES in addition to SSB.  Corus Group plc is the U.K. holding company of CES and CAI.

On July 11, 2001, the petitioners provided comment on Corus' questionnaire responses, and Corus responded to these comments on July 16, 2001. PDocs 94 & 97. Commerce published an affirmative preliminary determination with respect to Corus on August 2, 2001. *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Stainless Steel Bar From the United Kingdom*, 66 Fed. Reg. 40192, PDoc 109 (Aug. 2, 2001). Therein, Commerce *inter alia* denied Corus' claims for CEP offset and revised the general and administrative ("G&A") expenses to include restructuring costs related to production of non-subject merchandise. Commerce conducted verification of CES, CAI, and ASB between September and November 2001, CDocs 48, 50, 51, and Corus submitted revised sales and cost data on November 30, 2001 in response to request. The parties submitted case briefs on December 7, 2001 and rebuttal briefs on December 13, 2001. PDocs 146, 149, 151, 152. Among other aspects of the determination, Corus contested Commerce's denial of CEP offset and the G&A adjustment, and it additionally complained of the practice of "zeroing" negative margins. Following a public hearing, *see* PDoc 154 (Dec. 14, 2001), none of these issues were resolved in Corus' favor. *See Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Stainless Steel Bar from the United Kingdom*, PDoc 156 ( Jan. 15, 2002) ("*Decision Memo*"). On January 23, 2002, Commerce published its final determination of a margin with respect to Corus of 4.48%. *Final Determination*, 67 Fed. Reg. 3146, PDoc 162. *See Antidumping Duty Order: Stainless Steel Bar from The United Kingdom*, 67 Fed. Reg. 10381, PDoc 165 (Mar. 7, 2002). This action followed.

*Discussion*

Jurisdiction is pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c).  The standard of review is whether the challenged agency determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).  This standard requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).  However, substantial evidence supporting the agency's determination must be based on the whole record, and a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight." *Melex USA, Inc. v. United States*, 19 CIT 1130, 1132, 899 F. Supp. 632, 635 (1995) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 478, 488 (1951)).

I.

Corus first argues that substantial evidence does not support denial of "CEP offset."  CEP is one of two methodologies mandated by the antidumping statute for calculating U.S. price, the other being "export price" ("EP").  CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or seller, to a purchaser not affiliated

with the producer or exporter." 19 U.S.C. § 1677a(b). To the extent practicable, Commerce must establish for the purpose of comparison the NV of home market sales at the same LOT[3] as the subject U.S. sales, either EP or CEP. 19 U.S.C. § 1677b(a)(1)(B). If there are no sales for comparison at the same LOT, Commerce will make a LOT adjustment if it can determine that the comparability of prices are effected by the different LOTs. *See* 19 U.S.C. 1677b(a)(7)(A). If a LOT adjustment cannot be quantified, but NV is "established" at a different LOT than that of CEP (*i.e.*, the NV level is more remote from the factory), then the antidumping statute provides an adjustment of NV by the amount of home market indirect selling expenses up to the level of similar indirect selling expenses in the U.S. market, termed "CEP offset."[4] 19 U.S.C. § 1677b(a)(7)(B).

---

[3] LOT is defined by statute with respect to differences in selling functions in the two markets. 19 U.S.C. § 1677b(a)(7)(A). *See also Statement of Administrative Action*, H.R. Doc. No. 103-316 (1994) ("SAA"), reprinted in 1994 U.S.C.C.A.N. 4040, at 829 (to find that levels of trade are different, one requisite factor is "a difference between the actual functions performed by the two sellers at the different levels of trade in the two markets."). Commerce's regulations distinguish levels of trade based upon differences in "marketing stages." 19 C.F.R. § 351.412(c)(2). "Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing. Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing." *Id.* In addition, "[t]he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1).

[4] For a more detailed description of Commerce's LOT analysis, *see Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate from South Africa*, 62 Fed. Reg. 61731, 61732-33 (Nov. 19, 1997). Commerce interprets CEP offset to allow the lower of: (1) the indirect selling expenses on the home market sale; or (2) the indirect selling expenses deducted from the starting price in calculating CEP. The CEP offset regulation defines "indirect selling expenses" as "selling expenses, other than direct selling expenses or assumed selling expenses[,] . . . that the seller would incur regardless of whether particular sales were made, but that reasonably may be attributed, in whole or in part, to such sales." 19 C.F.R. § 351.412(f)(2). "Direct selling expenses" are "expenses, such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to the particular sale in question." 19 C.F.R. § 351.410(c).

(continued...)

CEP offset analysis thus compares the indirect selling activities that are undertaken outside the United States in support of the U.S. and comparison market sales. It is not automatic each time export price is constructed. *Micron Technology, Inc. v. United States*, 243 F.3d 1301, 1315-16 (Fed. Cir. 2001). It must be demonstrated that the LOT of the home market sales used for NV is more advanced than the CEP LOT and that there is no appropriate basis for determining whether such difference effects price comparability. The burden of proof is upon the claimant to prove entitlement. *See id.*; SAA at 829 ("if a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment").

Commerce denied CEP offset on the ground that CES's selling activities in support of U.S. sales were not substantially distinguishable from CES's selling activities in support of home market sales. Corus argues that Commerce's denial improperly increased the margin of dumping and was unreasonable, contrary to law and agency practice, and not supported by substantial evidence on the record. Corus maintains that CES "does virtually nothing but produce the merchandise and supply it to its affiliates" and that the rest of the selling activities for the U.S. market occurs in the United States. Pl.s' Br. at 6.[5] Corus believes the determination is based on misunderstanding the table

---

[4] (...continued)
"Assumed expenses" are defined as "selling expenses that are assumed by the seller on behalf of the buyer, such as advertising expenses." 19 C.F.R. § 351.410(d).

[5] Corus explains that in a typical CEP case "the vast bulk of sales activity occurs in the United States, and since all of that activity is removed from consideration in determining the levels of trade, the CEP offset is usually appropriate in CEP cases." Pl.'s Br at 5. It argues that CES's situation "falls precisely into the typical CEP pattern" because CES handles in the United Kingdom "every detail with respect to its home market sales . . . to get the good[s] marketed, ordered,
(continued...)

when compared with the narrative description of CES' selling activities in the United Kingdom and the United States. *See id.* at 7-13. *Cf.* PDoc 55, CDoc 9 *with* PDoc 86, CDoc 26, Ex. B16. The government and the petitioners essentially argue that Corus' submissions simply failed to demonstrate that NV is at a level of trade that is more remote from the factory than the CEP level.

The selling functions table itself is not substantial record evidence to support CEP offset. Corus argues that out of a total of 29 functions, the table must be interpreted as showing 16 "essential" selling activities supporting CEP offset, however only seven of these are tabulated as having been performed by CES at a higher level for the U.K. market than for the U.S. market while the remaining nine were tabulated at similar levels of intensity in both markets.[6] *See* PDoc 86, CDoc

---

[5] (...continued)
delivered, invoiced and paid for" but has "relatively few sales activities with respect to sales of its products to unaffiliated U.S. customers" since it relies on "affiliates with large staffs, warehouses, sales contracts, and significant operations, all located in the United States . . . to carry out nearly all the sales activities of the Corus Group with respect to the U.S. sales." Pl.'s Br at 5-6, referencing PDoc 55, CDoc 9, at A-10 to A-14, CDoc 51 (CAI verification report), and CDoc 50 (ASB verification report) at 3.

[6] *I.e.*, the selling functions table shows that CES performed market research, identification of customers and sales calls, price negotiation, offering discounts or rebates, credit checks, arranging for delivery, and warehouse maintenance at higher levels for U.K. sales than for U.S. sales, and it performed price approval, acceptance of purchase orders, order confirmation, order processing, producing shipping documents, issuance of invoices, extending credit, collecting payment, and "maintaining sales office" at the same intensity for both markets. *See* PDoc 86, CDoc 26, Ex. B16. The remaining 13 of 29 selling functions are indicated on the table as at the same level of intensity for both markets, but Corus explains that four involve "manufacturing" selling functions that must be performed by the producer in the United Kingdom in any event, another four involved import functions for the U.S. sales and are irrelevant to the analysis (and are denoted with "N" for "not performed" for either market), and the remaining five are sales brochure production, web site maintenance, after-sale technical support, and development of overall marketing support and sales strategy, which Corus characterizes as "trivial" selling functions. Pl.'s Br. at 13-14. The petitioners emphasize, nonetheless, that the evidence shows that CES accepts purchase orders, sends confirmations, arranges production, produces to order, arranges delivery, and issues invoices, for

(continued...)

26, Ex. B16. Nonetheless, Corus argues that it should have been clear to Commerce that these nine functions concerned the level of transaction between CES and its U.S. affiliates, not the end customers in the United States, and that such functions are irrelevant to a level of trade analysis in which Commerce "collapsed" CES and its affiliates for purposes of the investigation.[7] However, the nine "essential" functions would not appear irrelevant to analysis of CES's indirect selling activities with respect to the level of the first unaffiliated U.S. sale. If the argument is that "U.S. Sales" in the heading of the column "CES For U.S. Sales" on the selling functions table is ambiguous, and that the level of sale encompassed thereby is unclear, erroneous interpretation of latent ambiguity may be excusable,[8] but in this instance the ambiguity was manifest, since the

---

[6] (...continued)
sales in both markets, and that the "only" difference is that documentation for U.S. sales is issued to U.S. affiliates rather than to unaffiliated customers. Def-Int.s' Br at 5 (referencing PDoc 55, CDoc 9, at A-10 to A-22).

[7] Pl.s' Br at 7-8, 13-14 (referencing PDoc 55, CDoc 9, at A-18 to A-21). *See* 66 Fed. Reg. at 40196, PDoc 109. "Under 19 CFR 351.401(f), [Commerce] treats affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and where there is a significant potential for the manipulation of price or production, as evidenced by common ownership, interlocking boards of directors or shared management, or intertwined operations." *Antidumping Manual*, Ch. 7 at 24 (Dep't Comm., Jan. 22. 1998).

[8] Corus pleads that it made a good faith effort to complete the table and that any resulting confusion was the fault of Commerce's inexact instructions because Commerce

> has not established any objective standards or definitions for the terms "high, medium, or low" or [provided] any way to evaluate in an objective, quantifiable way the relative incidence of various activities.[ ] Nor did the Department indicate which selling activities should be listed, or what relative weight to give the existence or absence of any particular activity. Thus the table should not be subjected to a kind of close mathematical analysis, since the data represent the impressions and interpretations of personnel at CES and its various U.S. affiliates, and not measureable data or statistically

(continued...)

argument concedes application of different "U.S. Sales" definitions, depending upon selling function description.  Commerce should have been contacted for clarification.

On the other hand, Corus is correct that merely summing a list of supporting selling functions would be insufficient analysis of a CEP offset claim.  Commerce justified denial of CEP offset upon the observation that the majority of CES's selling activities were reported at the same level of intensity for both markets.  *Decision Memo*, Comment 9 at 32.  However, its practice is to examine not only the number of indirect selling functions undertaken outside the U.S. for the U.S. and comparison markets but also their weight and intensity.  *See Industrial Nitrocellulose From the United Kingdom; Notice of Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 6148, 6151 (Feb. 8, 2000) ("Contrary to the petitioner's assertion, selling functions do not carry the same weight").  *See also Gray Portland Cement and Clinker From Mexico; Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 13148, 13161 (Mar. 17, 1999); *Professional Electric Cutting Tools from Japan; Preliminary Results of Antidumping Duty Review*, 63 Fed. Reg. 30706, 30708 (June 5, 1998).  There may be circumstances where the significance of one or two indirect selling functions outweighs the significance of the rest.

However, in addition to that observation, Commerce concluded that Corus' administrative case brief had not resolve three alleged "discrepancies" to its "satisfaction other than by saying there is no discrepancy or there was confusion in interpretation."  *Decision Memo*, Comment 9 at 33.  Specifically, Commerce found discrepancy in the representations on the table that CES undertook

---

[8]  (...continued)
significant survey results.
Pl.s' Br. at 7 (referencing PDoc 36 (Questionnaire, Part A, question 3(c)) and CDoc 23).

"medium" home market research and "low" U.S. market research because the narrative response had indicated that CES sells to longstanding customers in both markets, that CES's identifying customers and making sales calls was "high" for the U.K. market and "low" for the U.S. market because Corus had stated in the sales process description of the questionnaire response that home market customers typically call or fax the Corus sales office with inquiries and then place orders by phone, fax, or mail, and that CES had "high" and "low" customer credit checking activities for the U.K. and U.S. markets respectively because credit checks "should be necessary when Corus sells to new and unfamiliar customers in the home market – not longstanding customers[.]" *Id.*

Corus argues that the table and the questionnaire responses are not contradictory. It argues that: (1) the fact that CES sells to longstanding and ongoing customers in both markets in no way contradicts the fact that CES carries on continuing market research at different levels for each market as stated on the table and furthermore Commerce "interviewed CES's home market sales people at verification and the verification reports do not reflect any doubt that they were fully employed with sales efforts directed [at] and finding new customers and making sales to existing ones[;]" (2) fax or email orders by customers are not "spontaneous, unsolicited events" but are preceded by "a considerable amount of sales activity by CES personnel[;]" (3) it is "not unthinkable or patently outrageous" that CES should have a credit check function despite the existence of longstanding customers because despite the maturity of the U.K. steel market new customers are sometimes identified and require credit evaluation, existing customers financial positions may change, or such customers may request different sales terms of a higher sales volume or level of credit.  Pl.s' Br. at 10-13 (referencing CDoc 48 (CES verification report) (Nov. 9, 2001) at 29-30; PDoc 55, CDoc 9,

at A-16 to A-18). Corus argues that "fiddling" with the precise levels of CES' selling activities is beside the point "because these activities are principally carried out by the U.S. subsidiaries, not by CES in England[,]" and are necessarily greater on a relative basis for U.K. sales than for U.S. sales. Pl.s' Br. at 13.

That may be so, but the record must still evince proof of the claim. Ultimately Corus complains that when Commerce conducted verification of the quantitative indirect expense data for CES, CIA and ASB, it never raised the issue of the alleged "deficiencies" regarding Corus' CEP offset claim. *See* PDoc 140, CDoc 48 (CES verification report) at 19-21; CDoc 50 (CAI verification report) at 6; CDoc 51 (ASB verification report) at 7. This implicates the parties respective duties.

Commerce is under a strict duty to investigate and determine the margin as accurately as possible. *See*, *e.g.*, *Lasko Metal Products, Inc v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994); *Allied-Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed. Cir. 1993); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). The method of verification is within Commerce's discretion, *e.g.*, *Rubberflex Sdn. Bhd. v. United States*, 23 CIT 461, 467, 59 F. Supp. 2d 1338, 1346 (1999), but the object of it is not. It is required that "all information relied upon in making . . . a final determination in an investigation" be verified. 19 U.S.C. § 1677m(i)(1). *Cf* 19 U.S.C. § 1677m(d) (if a response to a questionnaire that "does not comply" with a request for information, Commerce is obligated to notify the relevant interested party "of the nature of the deficiency" and provide the opportunity "to remedy or explain"). Further, Commerce is obligated to establish the NV of home market sales at the same LOT as the subject U.S. sales "to the extent practicable." *See* 19 U.S.C. § 1677b(a)(1)(B). Thus, upon a proper CEP offset claim Commerce has

the duty to inquire into and verify all such matters as will result in its proper resolution.  But, there must be a *prima facie* claim for CEP offset before the duty to verify it arises, *cf.  Tianjin Machinery Import & Export Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992) (requiring Commerce to seek new information under the guise of verification amounts to mandating that Commerce shoulder any burden that interested parties choose not to meet), which under Commerce's regulation requires a respondent to demonstrate the existence of differences in LOT which are "substantial." *See* 19 C.F.R. §§ 351.401(b)(1), 351.412(c)(2).

Commerce's methods of verification are reviewed for abuse of discretion. *See*, *e.g.*, *Shakeproof Assembly Components, Division of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1383-84 (Fed. Cir. 2001).  "Verification tests the facts upon which conclusions are to be drawn and indicates whether they will reflect an acceptable degree of certainty." *Smith Corona Corp. v. United States*, 771 F. Supp. 389, 399, 15 CIT 355, 366 (1991).  "[T]he function of verification is to corroborate information provided in questionnaire responses[.]" *Allied Tube & Conduit Corp. v. United States*, 898 F.2d 780, 786 (Fed. Cir. 1990).  The process of verification is only a "spot check" and is not intended to be an exhaustive examination of a respondent's business. *See*, *e.g.*, *Monsanto v. United States*, 12 CIT 937, 944, 698 F. Supp. 275, 281 (1988); *Hercules, Inc. v. United States*, 11 CIT 710, 673 F. Supp. 454, 469 (1987).  And it is superfluous if a response is corroborated or directly contradicted by other independently reliable information of record. *Cf. Maui Pineapple Co., Ltd. v. United States*, 27 CIT ___, ___, 264 F. Supp. 2d 1244, 1259 (2003) ("Commerce has considerable latitude in picking and choosing which items it will examine in detail. . . . In the

absence of evidence in the record suggesting the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value.").

In this instance, the preliminary determination notified Corus of Commerce's reasoning with respect to its claim for CEP offset prior to verification. *See* 66 Fed. Reg. at 40196. It was not unreasonable for Commerce to interpret the questionnaire response of CES's selling to longstanding customers in "both markets" as tending to contradict the representation of different levels of selling activity indicated on the selling functions table for the relevant selling function(s). On the other hand, Corus is correct that whether certain home market selling functions might have been more accurately described as less than "high" fails to address whether CES performed them at greater intensity relative to U.S. sales. Still, Commerce's overall reasoning at least indicated that, from its perspective, it had questions on whether CES's overall indirect selling levels were similar or different. Furthermore, Commere is presumed to have considered all relevant record information, *e.g.*, *Nakajima All Co. v. United States*, 14 CIT 469, 478, 744 F. Supp. 1168, 1175 (1990), and other information on the record detracts from the merit of CEP offset, including Corus' agreement in its case brief that market research activities in both the U.S. and home markets should have been reflected in the selling functions table at the same (moderate) level, since "both markets are mature with longstanding customers[,]" Corus' March 27, 2001 response that "CAI sells 'back-to-back'[9] to unaffiliated customers and maintains no inventory[,]" and Corus' April 12, 2001 response that "[m]ost of CES's sales of stainless bar in the United States are made directly to U.S. customers via

---

9 Commerce commonly refers to transactions involving sales from the foreign producer and/or exporter of subject merchandise to an affiliated company, who sells the merchandise to an unaffiliated U.S. buyer, as "back-to-back sales."

'back-to-back' sales through CAI, *with minimal involvement of the U.S. office.*[10] PDoc 156 at 32-33; PDoc 61 at C-12; PDoc 55 at A-7 (highlighting added). Commerce's concerns on the accuracy of the selling functions table, expressed prior to verification, were not unreasonable, and it was up to Corus to preserve its claim at verification.[11] The record does not evince abuse of discretion thereat, although Commerce merely "traced the selling . . . expenses excluded from the reported G&A expenses or the cost of sales denominator to supporting worksheets" and verified that CES's G&A expenses were accumulated at CES and allocated on a standard costing system. CDoc 48 at 20-21. Substantial evidence supports the determination to deny CEP offset.

## II.

The second issue concerns the administrative practice of "zeroing" all negative margins. Commerce's margin program calculates the difference between the adjusted U.S. price and the normal value, the difference being the potentially uncollected dumping duty ("PUDD"), for each

---

[10] The petitioners also contend that the selling functions table should reflect a "*higher* level of activity by Corus for arranging freight for U.S. sales than for home market sales, because U.S. shipments involve international freight arrangements and ocean transit and also involve customs and brokerage services." Def-Int.s' Br at 5 (petitioners' highlighting). The Court fails to discern where on the administrative record the petitioners raised this point to Commerce, however.

[11] *See* 19 C.F.R. §§ 351.401(b)(1), 351.412(c)(2). *Cf. Rubberflex Sdn. Bhd.* , *supra*, 23 CIT at 470, 59 F. Supp.2d at 1346 (1999) (the "rationale for requiring a respondent to report errors prior to verification . . . benefits both Commerce and respondent by ensuring that both parties are fully prepared for verification and that Commerce has an opportunity to review and digest changes to a respondent's data before verification"); *AK Steel Corp. v. United States*, 21 CIT 1265, 1275, 988 F. Supp. 594, 604 (1997) (respondent was aware prior to verification that Commerce would want to verify its model match characteristics and bore responsibility to bring any "documentation that it thought would help Commerce to accomplish this . . . to Commerce's attention during verification"); *Nation Ford Chemicals Co. v. United States*, 21 CIT 1371, 1374, 985 F. Supp. 133, 136 (1997) ("The burden of creating an adequate record lies with the party challenging Commerce's determination, not with Commerce.") (citation omitted).

product listed in a sales database. The program excludes or "zeros out" all negative PUDDs prior to summing individual PUDDs for all products and then dividing the resulting total by the total U.S. sales value to yield the weighted average dumping margin. Restated, sales with negative margins are excluded in the numerator of the formula but are accounted for in the denominator. Corus contends that this is improper and increased the margin of dumping which otherwise would have been *de minimis* or zero. Corus argues this policy is unfair, unreasonable, and contrary to law because it is not required by U.S. statute and is forbidden by a World Trade Organization ("WTO") panel and appellate body ruling, namely *European Communities -- Anti-Dumping Duties on Imports of Cotton-Type Bed Linen from India*, in which the European Commission's practice of zeroing non-dumped margins was found to violate Article 2.4.2 of the Antidumping Agreement.[12]

The U.S. statutory countermand of imported sales or likely sales at less than fair value is the imposition of antidumping duties equal to the excess of normal value over EP or CEP. 19 U.S.C.

---

[12] *See European Communities -- Anti-Dumping Duties on Imports of Cotton-Type Bed Linen from India*, WT/DS141/AB/R (Mar. 1, 2001) ("*EC Bed Linen*"). Article 2.4.2 of the Antidumping Agreement reads:

> Subject to the provisions governing fair comparison in paragraph 4, the existence of margins of dumping during the investigation phase shall normally be established on the basis of a comparison of a weighted average normal value with a weighted average of prices of all comparable export transactions or by comparison of normal value and export prices on a transaction-to-transaction basis.

Antidumping Agreement, Art. 2.4.2. In *EC Bed Linen*, the Appellate Body found that the EC's approach, which rejected import sales with negative margins, failed to include "*all* transactions involving *all* models or types of the product under investigation." *EC Bed Linen*, para. 55 (emphasis in original). The EC subsequently reformed its antidumping calculation methodology to conform to the requirements of the Appellate Body's decisions, and undertook to repeal or amend any prior antidumping findings that were inconsistent with that decision. *See Notice regarding the anti-dumping measures in force following a ruling of the Dispute Settlement Body of the World Trade Organisation adopted on 12 March 2001*, 2002 O.J. C111/04 (May 8, 2002).

§ 1673. "Dumped" and "dumping" are defined as "the sale or likely sale of goods at less than fair value." 19 U.S.C. § 1677(34). The dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A) In calculating a "weighted average dumping margin," Commerce is directed to consider "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." 19 U.S.C. § 1677(35)(B).

Because the antidumping statutes are silent regarding the treatment of negative margins, the practice of zeroing has been challenged a number of times in different contexts. In the context of an original investigation, Commerce's interpretation of the statute was found to "prevent a foreign producer from masking dumping with more profitable sales" and was therefore reasonable and in accordance with law. *Serampore Indus. Pvt. Ltd. v. Dep't of Commerce*, 11 CIT 866, 874, 675 F. Supp. 1354, 1360-61 (1987). Commerce's interpretation was again sustained in the context of an administrative review. *Bowe Passat Reinigungs-und Waschereitechnik GmbH v. United States*, 20 CIT 558, 572, 926 F. Supp. 1138, 1150 (1996). *Bowe* again noted the interpretation "combats masked dumping, an apparently legitimate goal consistent with the antidumping statute" but left open judicial review if, "*e.g.*, Commerce *erroneously* placed too much significance on the phenomenon of masked dumping[.]" *Id*. (highlighting in original; citations omitted). After *EC Bed Linen*, the issue was raised again in the context of an administrative review in *Timken Co. v. United States*, 26 CIT ___, 240 F. Supp.2d 1228 (2002). *Timken* essentially reaffirmed *Serampore* and *Bowe*, and again found the practice of zeroing a reasonable interpretation of 19 U.S.C. § 1673. *See*

26 CIT at ___, 240 F. Supp.2d at 1243-44.  Two recent decisions again considered, and sustained, the practice of zeroing.  *PAM, S.p.A. v. U.S. Dep't of Commerce*, Slip Op. 03-48 (CIT May 8, 2003) involved administrative review.  *Corus Staal BV v. U.S. Dep't of Commerce*, Slip Op. 03-25 (Mar. 7, 2003) involved a less-than-fair-value investigation.  Both decisions considered and addressed the same arguments that have been raised in this matter.

In accordance with *Corus Staal*, the Court must sustain Commerce's zeroing methodology as applied in this investigation with respect to Corus.[13]

III.

The last issue concerns Commerce's inclusion of certain restructuring costs in the general and administrative ("G&A") expense component of Corus' cost of production.  *See* 19 U.S.C. § 1677b(b)(3)(b).[14]  The restructuring costs resulted from closure of an electric arc furnace and a rolling mill that had been devoted to production of non-subject merchandise.  *See* CDoc 12 (Section D response) at 3-6; CDoc 48 (CES verification report) at 2.  The effect of Commerce's re-allocation increased the constructed cost of production for Corus and the resulting margin for the subject merchandise.  Commerce explained that "during their productive cycle the expenses associated with fixed assets are absorbed by the merchandise those assets produce[;] . . . once the assets are decommissioned, the company as a whole has to bear the expenses associated with the closure

---

[13]  The Court notes in passing the European Commission's recent request for consultations with the United States  before the WTO regarding Commerce's zeroing practice.  *See* 68 Fed. Reg. 43248 (July 21, 2003); WT/DS-294/1, Doc 03-3263 (June 19, 2003).  Japan, Korea, India, and Mexico have requested to join these.  *See* WTO Docs 03-3499, 03-3501, 03-3506 & 03-3538.

[14]   The parties do not outline the impact of the instant claim, however it appears from the record that calculation of SSB COP determined the number of excludable below-cost sales in the home market for purposes of the investigation.  *Cf.* 67 Fed. Reg. at 3148 *with* 19 U.S.C. § 1677b(b).

because the assets are no longer productive." *Decision Memo*, Comment 3 at 20-21 (referencing *Hot Rolled Steel From Japan*, 64 Fed. Reg. 24329, 24350 (May 6, 1999)).  Commerce further stated that the result is consistent with its current practice of considering this type of expense properly allocable to the cost of producing subject merchandise.[15]

Corus argues that Commerce's methodology is improper because the decommissioned assets were devoted exclusively to producing non-subject merchandise.  Corus agrees that if a product line is closed entirely, the closing costs related to that line must be absorbed by the company as a whole, however it argues that "extraordinary costs directly related solely and exclusively to a discrete product group should properly be allocated strictly to that product group," *i.e.*, if the facilities that were closed were only a small component of a product line that continues in full commercial operation at other plants, such costs are appropriately assigned to the remaining facilities that continue to manufacture that product line.  Corus complains that the instant proceeding stands in contrast to *Certain Hot-Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom*, 60 Fed. Reg. 44009, 44012 (1995), in which Commerce excluded for CES (formerly "UES") non-subject merchandise restructuring costs from the G&A expense calculation because the decommissioned facilities were not involved in the production of subject merchandise, and it further

---

[15] *Decision Memo*, Comment 3 at 20 (referencing *Notice of Final Determination of Sales at Less than Fair Value: Stainless Steel Sheet and Strip in Coils, From Japan*, 64 Fed. Reg. 30574, 30590 (June 8, 1999) (Comment 3); *Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan*, 64 Fed. Reg. 24329, 24354 (May 6, 1999)).  *See also, e.g.*, *Certain Corrosion- Resistant Carbon Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 8935, 8940-41 (Feb. 23, 2000) (Comment 5); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil*, 65 Fed. Reg. 5554, 5582 (Feb. 4, 2000) (Comments 23).

argues that Commerce's practice in this area has been inconsistent.  Pl.s' Br. at 23-25, referencing

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France,*

*Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom*, 65 Fed. Reg. 49219,

49223 (Aug. 11, 2000); *Final Determination of Sales at Less Than Fair Value: Certain Carbon and*

*Alloy Steel Wire Rod from Canada*, 59 Fed. Reg. 18791, 18795 (1994).

The argument implicates the "arbitrary and capricious" standard of review.  *See*

Administrative Procedure Act, 5 U.S.C. §§ 706 *et seq*.  That is a narrower inquiry than review of an

administrative record for substantial evidence.  The mere fact that an agency reverses a policy or a

statutory or regulatory interpretation is insufficient reason to find such change arbitrary or capricious.

*See*, *e.g.*, *Mantex, Inc. v. United States*, 17 CIT 1385, 1399, 841 F. Supp. 1290, 1302-03 (1993)

(citing *Rust v. Sullivan*, 500 U.S. 173, 186 (1991) (citation omitted)); *Queen's Flowers de Colombia*

*v. United States,* 21 CIT 968, 976-77, 981 F. Supp. 617, 625-26 (1997).  A reviewing court must

> consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . .  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citations

omitted).  The standard requires that "the agency . . . examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found and

the choice made.'" *Mot. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Court is unable to conclude that Commerce's explanation is unreasonable. Also known as "full cost," the statutory calculation of the cost of production of the foreign like product requires "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question[.]" 19 U.S.C. § 1677b(b)(3)(b). "G&A expenses are those expenses which relate to the activities of the company as a whole rather than to production process." *Rautaruukki Oy v. United States,* 19 CIT 438, 444 (1995). Although Commerce "typically allows individual respondent companies to report the production costs of subject merchandise as valued under their normal accounting methods and following GAAP of their home country[,]" *Final Determination of Sales at Less Than Fair Value: New Minivans from Japan*, 57 Fed. Reg. 21937, 21947 (May 26, 1992) (Comment 21), in this instance Commerce implicitly found that the restructuring expenses are general expenses "relate[d] to the company's operations as a whole[.]" *Decision Memo*, Comment 3 at 20. Courts have acknowledged the fungibility of corporate financing matters irrespective of subject and non-subject production.[16] While it may be true that costs are not fungible, and that not every indirect cost is appropriately allocable to the "cost" of a particular unit of production or sales,[17] based on the

---

[16] *Cf. American Silicon Technologies v. United States*, 334 F.3d 1033 (Fed. Cir. 2003); *NTN Bearing Corp. of America v. United States*, 27 CIT ___, ___, 248 F. Supp. 2d 1256, 1265 (2003); *E.I. DuPont de Nemours & Co. v. United States*, 22 CIT 19, 23 (1998).

[17] To take an immediate example, Commerce's own CEP offset regulation, *supra* footnote 4, defines "indirect selling expenses" as other "selling expenses . . . that the seller would incur regardless of whether particular sales were made, *but that reasonably may be attributed*, in whole or in part, to such sales." 19 C.F.R. § 351.412(f)(2) (highlighting added). The proper accounting treatment of "stranded" costs is another (stranded costs are frequently defined as the value of unamortized investments in assets that can not currently be recovered in a competitive marketplace, or the difference between the market value and the book value of these assets). It may also be of

(continued...)

presentations of the parties in this matter the Court is unable to conclude that there was no rational

basis for Commerce's determination.

### *Conclusion*

Accordingly, judgment will be entered in favor of defendant.

_____
                                R. KENTON MUSGRAVE, JUDGE

Dated: August 27, 2003
        New York, New York

_____

[17] (...continued)
some significance that the "proper" treatment of restructuring cost recognition and disclosure has received much -- and ongoing -- attention of late by the accounting profession, the Securities Exchange Commission, the Financial Accounting Standards Board ("FASB"), and the International Accounting Standards Board ("IASB"). *See* Accounting Principles Board Opinion No. 30, *Reporting the Results of Operations--Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions* (June 1973); FASB Statement No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* (August 2001); FASB Statement No. 146, *Accounting for Costs Associated with Exit or Disposal Activities* (June 2002). *See also* Staff Accounting Bulletin No. 93, Release No. 93-SAB, 55 S.E.C. Docket 984 (Nov. 4, 1993) (clarifying SEC position on presentation and reporting for discontinued operations). On August 4, 2003, IASB released Exposure Draft ED-4, *Disposal of Non-current Assets and Presentation of Discontinued Operations* (Aug. 4, 2003) for comment as an objective of accounting standards convergence. *See* IASB Press Release of July 24, 2003. The parties provide no briefing on what the impact of the foregoing might be on the immediate issue(s), however.